Rockingham,
June 28, 1934.

ORRIN M. JAMES, *Ex'r, v.* MARTHA J. STAPLES, *Ap't.*

*Sewall & Waldron* and *Oscar Neukom* (*Mr. Waldron* orally), for the appellee.

*William H. Sleeper* and *John W. Perkins* (both orally), for the appellant.

MARBLE, J. The will was written by the executor's wife with her fountain pen at the executor's dictation. The first page contains seven clauses. Each clause comprises only three lines and the subject-matter of each is a simple bequest. The second page contains four clauses establishing various trusts and conditional gifts and a final clause appointing Orrin M. James executor and trustee.

Clarence R. Bickford, one of the subscribing witnesses, testified that the document "was laid out flat on the table" when he signed as witness and that there was no writing on the second page. The executor and his wife took the will with them after its execution, and

it could be found on the evidence that the second page was written by them at a later time. But this fact, if found, would not of course invalidate the will as it existed at the time the testator signed it.

Wilbur F. Turner, an "expert examiner and photographer" of handwriting, inks and paper, testified that the second page "shows an extreme difference in the line quality, difference in pen pressure, and difference in the density of the ink, showing it to have been written slowly and different, not normally, as the first page." He found that the first page was written before the paper was folded and declared that the second page showed "without a question" that it "was written after the paper had been folded, and at another time." Other experts testified to the same effect. There was also evidence of an admission on the executor's part that the will had been made piecemeal.

By the ninth clause the sum of four thousand dollars was given the Free Will Baptist Church of Northwood Ridge in memory of the testator's mother. The testator was a member of the Advent church and "wasn't very tolerant of any other creed." The executor was a member and clerk of the church at Northwood Ridge. There was evidence that the testator's mother usually attended church at Northwood Narrows, so called.

So far as appears, the testator had never shown any interest in books or public benefactions, yet he left the residue of his estate "to build, and equip at Northwood Narrows a free public library for the town of Northwood, N. H." The executor was at that time a library trustee in Northwood. He was named "trustee of said library" in the will.

The sum of three thousand dollars was left the executor with which to purchase a fire equipment for the town of Northwood. The testator had previously said that "one of the old style tubs" was "just as good for Northwood as any."

A small bequest was left to a girl who lived in the executor's home. There is no evidence that the testator had any particular interest in this girl.

There is abundant evidence that the testator at the time of the execution of the will was of unsound mind. It is true, as counsel for the executor suggest, that "the mass of testimony bearing upon Mr. Bryant's testamentary capacity" is "in no way conclusive," but this does not mean that the issue is any the less one of fact.

While in order to justify the disallowance of a will on the ground of undue influence it must appear that the influence charged is the

equivalent of force and coercion (*Knox* v. *Perkins*, 86 N. H. 66, 68, and cases cited), it is obvious that less influence is required to coerce a weak mind than to dominate a strong one (*Harvey* v. *Provandie*, 83 N. H. 236, 240).

The will was executed only a few days after the death of the testator's wife and on the day following the arrival of the appellant.

Fred Loranger, an old-time friend, came to stay with the testator immediately after Mrs. Bryant's funeral. According to his own testimony he urged the testator to make a will at once, intimating that unless he did so the appellant would "grab" his property.

For a few days preceding the execution of the will Clarence R. Bickford was at the testator's house "a good part of the time." The following is quoted from his testimony: "Q. Now I want you to tell the jury, Mr. Bickford, what talk you heard there about property or about Mrs. Staples made there beginning on Monday, what the nature of the talk was and who made it? ... A. Well, the whole talk was on making wills, folks coming in and grabbing, his term was used, all that is left, whatever you had ... Mr. Loranger was talking all the time, that just as soon as anyone died they would come in and they would grab what they had, he says, 'Those people who have been the most familiar will be forgotten, they won't get anything out of it; those people who have know[n] you all your life; people will come in, outsiders will come in, even your relatives will come in.' Q. Did he talk against Mrs. Staples? A. Yes.... Q. And didn't you hear him on that day, on Monday and also on the following day, Tuesday morning, talk quite forcibly with Mr. Bryant as if trying to induce him to make a will? A. Yes, sir.... Q. Didn't he in your presence accuse some of his own people in connection with his own wife's estate, to try to get Mr. Bryant to consent to make a will? A. I don't know as you would call it accusing; he said 'Take it in my case; just as soon as my wife died they came in, grabbing this and grabbing that.' I don't know as he accused. Q. In fact, Mr. Bickford, didn't you yourself take, without much knowledge of the woman, ... an encouraging attitude along that same line at that time? ... Didn't you join in with Mr. Loranger at first, Mr. Bickford? ... A. I am ashamed to admit I did."

The testator had been on good terms with the appellant. He had said that he wanted "Martha's [the appellant's] girls to have a thousand dollars apiece" and "Martha to have the rest." The appellant received only a thousand dollars under the will. The same sum was bequeathed to Loranger.

In view of the evidence relating to the testator's incompetency it cannot be said as a matter of law that a finding of undue influence was not justified.

Since the printed record comprises over five hundred pages, anything like an adequate summary of all the evidence is impracticable. Enough has been stated, however, to demonstrate unquestionably that all three issues were for the jury.

The presiding justice correctly ruled that he had no power to disregard the findings of the jury and pass upon the evidence himself. Furthermore, even if the court had expressly undertaken to reserve the right of review, such reservation would have been invalid unless the parties had agreed to it.

It is provided by statute in this state that on a probate appeal "if any fact material to the cause shall be disputed, the court may direct an issue proper to try such fact to be framed, and ascertain the same by the verdict of a jury." P. L., c. 311, s. 11.

"Since there is no constitutional right to a jury trial [in probate appeals], the legislature may grant the right to trial by jury to the same extent as such right exists at common law; or it may grant it with restrictions, either as to the nature and extent of the right, or as to the circumstances under which it may be had, or it may make the verdict purely advisory, or it may not grant the right at all." 1 Page, Wills (2d ed.), s. 572.

"In this class of cases, before the adoption of our Constitution, there was an appeal from the judge of probate to the governor and council, and neither of these tribunals held trials by jury at all . . . .

"When, therefore, it was provided in our Constitution, Bill of Rights, Art. 20, that 'in all suits between two or more persons, except in cases in which it has been heretofore otherwise used and practiced, the parties have a right to trial by jury,' it must be understood that controversies and questions of fact arising on appeal from the judge of probate, fell within the exception, as cases in which it had been otherwise used and practiced.

"In the act of 1791, (N. H. Laws, 1815, 219) provision was made for appeals from commissioners on insolvent estates, and for the trial of such claims in court, the same as in cases of appeal from the court of common pleas; and, in the act of July 2, 1822, (N. H. Laws, 1830, 274) it is provided, 'that, when, on an appeal from a judge of probate, any fact material to the cause shall be disputed, the court may direct an issue proper to try such fact, to be formed, and ascertain the same by the verdict of a jury'." *Patrick* v. *Cowles*, 45 N. H. 553, 555.

At the time the opinion was rendered in *Patrick* v. *Cowles* the court had already interpreted the statute authorizing the submission of an issue by the superior court to the court of common pleas as applying "to matters in equity as well as at law" and had held that facts thus "ascertained" by a jury in equity suits could not be disregarded by the court. *Clark* v. *Society*, 45 N. H. 331, 338.

The rule of *Clark* v. *Society* was approved after the passage of G. L., c. 231, s. 19, relating to the trial of facts by jury in equity cases (*Free* v. *Buckingham*, 59 N. H. 219, 223), and again after the passage of P. L., c. 339, s. 23. (*Berry* v. *Merrill*, 85 N. H. 525). While these statutes differ materially (Comm'rs' Report, 1891, c. 226, s. 21, margin), the difference relates mainly to procedure. Each authorizes but does not require the framing of proper issues under the direction of the court.

The case of *State* v. *Saunders*, 66 N. H. 39, is not an authority in support of the executor's position. The principal question there decided is that a defendant in an equity proceeding has no constitutional right to a jury trial. In reviewing the English chancery practice reference is made (*p.* 79) to the "advisory verdict" of the jury in equity cases, but no question concerning the construction of G. L., c. 231, s. 19, is raised and the statute does not receive judicial interpretation. The case of *Clark* v. *Society* had no bearing on the question there presented and is not cited. For a like reason it was unnecessary in *Berry* v. *Merrill* to refer to *State* v. *Saunders*.

Cases in other jurisdictions are of little weight since the question is one of legislative intent. While the case of *Evans* v. *Evans*, 78 N. H. 352, holds that the office of an issue "is to enable a jury to aid the court in determining the rights of the parties," it does not hold that the court is not bound by the verdict of the jury on the issue framed. Neither does the case of *Genest* v. *Company*, 75 N. H. 365 (cited in 1 Whitehouse, Equity Practice, s. 377, as adopting the general chancery rule) so hold. On the other hand, it has been definitely decided that "In this jurisdiction the trial judge can no more disregard the verdict of a jury in an equity case than in an action at law." *Berry* v. *Merrill*, 85 N. H. 525, 526. "There is no good reason for a different rule in the trial of issues to a jury in a probate appeal from that which applies to suits in equity." *Crocker* v. *Crocker*, 188 Mass. 16, 20.

The appellant's exception to the order of the court setting aside the verdict because the jury were actuated by prejudice presents no question of law. *Exeter Banking Co.* v. *Taylor*, 85 N. H. 458, 462.

The order was based upon the "personal observation" of the presiding justice (*Lavigne* v. *Lavigne*, 80 N. H. 559, 561), and the indifference and inattention of the jurors. Their attitude toward witnesses and testimony cannot be reproduced by the written record (*Wilcomb* v. *Duston*, 82 N. H. 180). Under such conditions the order will not be disturbed. *Slocinski* v. *Radwan*, 83 N. H. 501, 508. The presiding justice was not obliged to specify in greater detail the grounds on which his findings were based.

*New trial.*

All concurred.